## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

REX ALLEN GREGORY,              )
                                       )
                Plaintiff,        )
                                       )
vs.                                )   Case No.  15-cv-905-JPG-CJP
                                     )
NANCY A. BERRYHILL,          )
Acting Commissioner of Social Security,   )
                                       )
             Defendant. [1]    )
                                       )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. §405(g), plaintiff Rex Allen Gregory is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).

### Procedural History

Plaintiff applied for benefits on June 7, 2012, alleging disability beginning on November 30, 2011. (Tr. 17). After holding an evidentiary hearing, Administrative Law Judge (ALJ) Karen Sayon denied the application for benefits in a decision dated March 21, 2014. (Tr. 17-28). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  See, *Casey v. Berryhill*, __ F3d. __, 2017 WL 398309 (7th Cir. Jan. 30, 2017).  She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g).

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ failed to give meaningful consideration to a functional capacity evaluation.

2. The ALJ failed to properly consider state agency medical consultant opinions when she determined that plaintiff's carpal tunnel syndrome was not severe.

3. The ALJ did not give appropriate weight to the findings of the consultative examiner regarding plaintiff's carpal tunnel syndrome.

4. The ALJ did not give appropriate weight to the findings of the consultative examiner regarding plaintiff's ability to squat and rise.

**Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer

leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Sayon followed the five-step framework described above. She determined that plaintiff had not been engaged in substantial gainful activity since his alleged onset date. She

found that plaintiff had severe impairments of degenerative disc disease of the lumbar spine, bipolar disorder, and substance abuse. (Tr. 19).

The ALJ found plaintiff had the residual functional capacity to perform work at the light level, with physical and mental limitations. (Tr. 20-22). Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past work. (Tr. 21). However, he was not disabled because he was able to perform other work that existed in significant numbers in the regional and national economies. (Tr. 27-28).

## The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

### 1. Agency Forms

Plaintiff was born on November 23, 1964 and was forty-seven years old at his alleged onset date. (Tr. 226). He was insured for DIB through December 31, 2016. [3] He was five feet eleven inches tall and weighed one hundred and seventy pounds. (Tr. 230). He completed high school in 1982 and had an industrial electrician certification. He previously worked as a cable television installer, an industrial electrician, and a roofer. (Tr. 231).

Plaintiff claimed his bi-polar disorder, lumbar fusion, pain in his cervical and lumbar spine, arthritis, and carpal tunnel syndrome limited his ability to work. (Tr. 230). In June 2012, he was taking Abilify for bipolar disorder, and Xanax and Zolpidem for anxiety. (Tr. 233).

In July 2012, plaintiff completed a function report. (Tr. 269-77). Plaintiff lived in a house with family and stated that he could only sit or stand for fifteen minutes at a time due to neck and

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI. See, 42 U.S.C. §§ 423(c) & 1382(a).

back pain. Additionally, he could not get through an hour without lying down, he had numbness and pain in his hands, and his bipolar disorder limited his mental abilities and concentration. (Tr. 269). He stayed at either his brother's or mother's home, and during the day he alternated between sitting, walking, and lying down due to pain. His pain kept him awake and he was only able to sleep for two or three hours at a time. It took plaintiff about an hour to get dressed and he needed help to tie his shoes. (Tr. 270).

Plaintiff stated that he had to leave himself notes in order to remember to shampoo his hair and wash his feet. His family members had to remind him to take his medicine. He could make himself sandwiches or microwavable meals, but could no longer cook or barbecue. Plaintiff put his clothes in a laundry basket and was able to make his bed. (Tr. 271). Plaintiff felt his back pain limited his ability to do house or yard work. He stayed with either his mother or his brother, so every day he had to be taken from one home to another. He could not drive due to his back pain. He did none of the shopping and his family members had to purchase everything he needed. (Tr. 272). He was unable to handle his finances. (Tr. 272-73).

Plaintiff claimed he had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, using his hands, and getting along with others. He could walk two blocks very slowly before needing to rest for a few minutes. He could pay attention for five minutes at a time and did not follow instructions well. (Tr. 274). He had a difficult time accepting criticism. Plaintiff stated he had been removed from two planes by police. He did not handle stress or changes in his routine well. He used a walker, wheel chair, and a cane to help him ambulate. (Tr. 275). He took several medications and stated that lithium, Xanax, and trazodone made him drowsy. (Tr. 276).

Plaintiff's mother also completed a function report in March 2013. (Tr. 297-304). She stated that she spent a significant amount of time with plaintiff daily. (Tr. 297). She stated that he did his laundry once a week and it took an entire day to complete. (Tr. 299). She stated that plaintiff could drive for fifteen to twenty minutes and he shopped for personal hygiene items once a month. (Tr. 300). He watched television and sometimes went fishing with his family. (Tr. 301).

Plaintiff's mother believed he had difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. She stated plaintiff could walk about two blocks before needing to rest for about five minutes. (Tr. 302). She felt plaintiff did not do well with authority figures, stress, or changes in his routine. She stated that plaintiff had a mental breakdown and was institutionalized. Plaintiff occasionally used a walker, cane, and a back brace. (Tr. 303).

## 2.  Evidentiary Hearing

Plaintiff was represented by counsel at his evidentiary hearing on March 6, 2014. (Tr. 31). Plaintiff testified that he was technically homeless but stayed at the home of his brother, mother, sister, or his friends. (Tr. 34). His driver's license was suspended due to past-due child support payments. He received general assistance from Randolph County and food stamps but had no other source of income. He testified that he had not worked since November 2011. He attempted to mow grass at a cemetery and tried to score trapshooting at a shooting complex, but was unable to maintain employment. (Tr. 35).

Plaintiff stated that he used to work as an industrial electrician at factories. He would troubleshoot, repair, and maintain electrical equipment. He testified that he would occasionally

have to lift up to one hundred pounds at that job. He learned how to be an electrician in the United States Navy. (Tr. 37). He was also a roofer for about five years and an installer of cable television for several years. (Tr. 37-38).

Plaintiff felt the main reason he could not work was his lack of mobility. (Tr. 38). He testified that his left leg was numb, he had a significant amount of pain, he fell down frequently, and he had an unstable gait. (Tr. 38-39). He saw his general physician who gave him steroid shots, muscle relaxers, and painkillers for his back. He stated that he received steroid shots a few times every year. At the time of the hearing, plaintiff was taking Norco, ibuprofen, and Tramadol for pain. Plaintiff has a history of substance abuse and last drank alcohol six or seven months prior to the hearing. (Tr. 39). He stated that he "probably smoked marijuana at some point in the last year." (Tr. 40). The ALJ noted that plaintiff's records indicated he drank in November of the previous year (four months prior to the hearing) and plaintiff stated that was probably correct. He testified that he drank to the point of intoxication and probably drank that amount four times in the last year. (Tr. 40).

Plaintiff received treatment for substance abuse. He went to AA meetings and saw a counselor who also helped with plaintiff's mental health. He took Prozac, Seroquel, and Inderal for his mental health issues. (Tr. 41). The Prozac caused him to have tremors but the other medications helped subdue the tremors. He had headaches and general nausea from the medications. Plaintiff stated he believed his mental health was stable at the time of the hearing. In November 2011 he had a nervous breakdown and was hospitalized as a result. He was hospitalized three more times, but plaintiff believed he had been stable for about one year. (Tr. 42). Plaintiff felt his mental health issues prevented him from working because he had difficulty

getting along with others. He owed child support, taxes, and he was in the process of paying the State's Attorney for a bad check he wrote. (Tr. 43).

On a typical day, plaintiff testified that he woke up and took a shower at his brother's home. He then had his mother bring him into town because he ate at her house. He would watch television at his mother's house and he helped her with a puzzle. He could walk to a friend's house from his mother's home and sometimes he would stay there for the afternoon socializing and watching television. After that, his brother would bring plaintiff back to his house where he would watch television and sleep. He enjoyed fishing and drawing, but could no longer play the drums. (Tr. 44). He stated he could not play the drums because his right foot could not kick the bass drum and he no longer had feeling in his hands. (Tr. 46). Plaintiff had difficulty with buttons and zippers because of his issues with his hands. (Tr. 47). He could sit and sketch for about twenty minutes at a time because he could not sit for longer than that without needing to reposition himself. (Tr. 46). At the time of the hearing, plaintiff was in the process of applying for jobs such as cashier and general laborer. (Tr. 45).

A vocational expert (VE) also testified. (Tr. 48-53). The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform light work but could not climb ladders, ropes, or scaffolding. Additionally, the individual could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. The person should have no concentrated exposure to respiratory irritants. The person could not carry out detailed or complex tasks; but could maintain sufficient concentration, persistence, or pace to appropriately and timely complete routine tasks. The work should involve simple instructions and only occasional changes in the work place

setting, as well as no public transportation. (Tr. 50). Additionally, the person could perform frequent, but not constant handling and fingering bilaterally. (Tr. 51).

The VE testified that the individual could perform jobs that exist in a significant number within the national and regional economies. Examples of such jobs are inspector, bench assembler, and sorter.  (Tr. 51). The individual could not maintain competitive employment if they needed to take a fifteen minute break after every forty-five minutes of work or if they missed three days of work per month. (Tr. 51). The VE also testified that based on her experience, if the individual could only occasionally bilaterally handle and finger the vast majority of jobs would be precluded. (Tr. 52-53).

### 3.  Medical Evidence

Plaintiff had a lumbar discectomy at L4-5 in June 2007. (Tr. 361). In May 2009, plaintiff underwent a right L4-5 revision laminotomy[4] and microdiscectomy with an autologous iliac crest bone graft.[5] (Tr. 358-59). Plaintiff had physical therapy and several follow up treatment reports where the record indicates he recovered well from the surgeries. (Tr. 335). In September 2011, plaintiff was hospitalized for four days due to suicidal and homicidal ideation. (Tr. 395-98). His discharge diagnoses included substance abuse induced mood disorder which was much improved since becoming clean of cocaine and cannabis, cannabis dependency, cocaine abuse, a history of depressive disorder, and borderline personality disorder. (Tr. 395). Later that month, plaintiff was again hospitalized for suicidal ideation, but this time for sixteen days. (Tr. 417-22). His

---

[4] A laminotomy is "[a] procedure for treating herniation of an intervertebral disc, consisting of removing a portion of the superior and inferior aspects of the lamina adjacent to the diseased disc." http://medical-dictionary.thefreedictionary.com/laminotomy

[5] "Autograft (sometimes referred to as autologous bone or autogenous bone graft) is taken from the patient and transferred to the portion of the spine to be fused. During the spinal fusion surgery, a separate surgical procedure is conducted to remove bone from another part of the patient's body and place it in the area of the spine to be fused. This is a surgical process called "harvesting" the bone graft. This procedure is usually done through a same incision in posterior fusions and through a separate incision on anterior fusions. Bone is usually harvested from one of the patient's bones in the pelvis (the iliac crest)." http://www.spine-health.com/treatment/spinal-fusion/autograft-patients-own-bone

discharge diagnoses were bipolar disorder, alcohol dependence, and cannabis dependence. (Tr. 421). For seven days in November 2011, plaintiff was hospitalized for treatment of his bipolar disorder, polysubstance abuse and dependence, and borderline traits. (Tr. 464-72).

Plaintiff's alleged onset of disability is November 30, 2011. While his medical records are somewhat extensive, plaintiff's arguments focus primarily on medical opinions from the state agency consultants and the functional capacity evaluation completed by a physical therapist. The Court will briefly discuss the records that relate to these opinions.

In October 2013, plaintiff saw a physician's assistant to help with back pain. (Tr. 990-93). Plaintiff was prescribed Medrol and Flexeril for pain. The physician's assistant opined that plaintiff had acute sciatica at L4-5 due to a discectomy with fusion. (Tr. 993). From 2011 through 2014, plaintiff regularly saw counselors at the Human Services Center for his mental health issues. (Tr. 525-37, 559-65, 995-1079). The records indicate he had chronic back pain due to lumbar fusion. (*E.g.*, Tr. 533, 537, 1034, 1035, 1039). Some records also contain statements that plaintiff was walking "a lot" (Tr. 1037, 1039, 1041). There are no additional medical reports on record regarding plaintiff's back problems.

### 4. Physical Therapist Opinion

In January 2014, a physical therapist, Andy Vitale, completed a functional capacity evaluation of plaintiff's physical capabilities. (Tr. 979-85). Plaintiff estimated that he could sit for up to an hour occasionally and less than forty-five minutes continuously, and that he could stand or walk for less than one hour occasionally and less than fifteen minutes continuously. Plaintiff could occasionally bend, stoop, reach above shoulder level, perform fine finger movements, and perform hand eye coordinated movements. (Tr. 979). Mr. Vitale indicated plaintiff was limited in his cervical, shoulder, knee, and lumber active range of motion, and he

had decreased strength in his right knee and ankle. Further, plaintiff had a mild decrease in his right knee reflex and displayed decreased sensation on the right hand and left index finger. Mr. Vitale stated that all occasional lift tests were terminated by plaintiff due to subjective complaints of pain. (Tr. 980).

### 5.  Consultative Examination

In September 2012, plaintiff had a physical consultative examination with state agency internist Vittal Chapa, M.D. (Tr. 549-52). Plaintiff told Dr. Chapa he was bipolar and that he had two surgeries on his back. Plaintiff stated he took Vicodin and Flexeril for pain and on a scale of one to ten his back pain was typically a seven. (Tr. 549). Dr. Chapa's diagnostic impressions were chronic lumbosacral pain syndrome with radiculopathy, bilateral carpal tunnel syndrome, and a history of a psychiatric disorder. (Tr. 551). Dr. Chapa noted that plaintiff had a history of chronic back pain and weakness of the extensors of the right first toe and the dorsiflexion of the right ankle. Plaintiff's knee reflexes were 3+, ankle reflexes were 2+, and he had a positive Tinel's sign[6] in both wrists.

### 6.  RFC Assessments

In August 2012, plaintiff's mental RFC was assessed by state agency psychologist Donald Henson, Ph.D. (Tr. 55-61, 64-67). He reviewed plaintiff's records but did not examine plaintiff in person. Dr. Henson opined that plaintiff would have moderate restrictions in his activities of daily living and moderate difficulties maintaining social functioning. Plaintiff had mild difficulties in maintaining concentration, persistence, or pace and had one or two episodes of decompensation on record. (Tr. 60). He also opined that plaintiff would be moderately limited in his ability to: carry out detailed instruction; and activities within a schedule maintain regular

---

[6] Tinel's sign is "[a] method for checking the regeneration of a nerve: usually in patients with carpal tunnel syndrome. Direct tapping over the sheath of the nerve elicits a distal tingling sensation[], which indicates the beginning of regeneration." http://www.oxfordreference.com/view/10.1093/oi/authority.20110803104713282

attendance, and be punctual within customary tolerances; and interact appropriately with the general public. (Tr. 64-65). Dr. Henson explained that plaintiff had "a history of mental health services for symptoms of depression related to substance abuse which would appear to impose some limitation in his ability to satisfactorily perform detailed activities of a somewhat complicated nature." (Tr. 65). He further explained that, "[r]egardless, he performs chores and engages in leisure activities and possesses sufficient cognitive and attentional abilities to perform simple routine activities which have limited involvement with the general public. Adaptive behaviors are adequate for vocational involvement." (Tr. 65).

In March 2013, plaintiff had a second mental RFC assessed by state agency psychologist M.W. DiFonso Psy.D. (Tr. 83-90, 94-95). She reviewed plaintiff's records but did not examine plaintiff in person. She opined that plaintiff was moderately limited in his ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and interact with the general public. (Tr. 94-95).

Plaintiff's physical RFC was first assessed in August 2012 by state agency physician B. Rock Oh. (Tr. 60-64). Dr. Oh felt plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds. Plaintiff could stand, walk, or sit for about six hours in an eight hour workday. (Tr. 62). Dr. Oh opined that plaintiff could occasionally: climb ladders, ropes, scaffolds, stairs, and ramps; balance; stoop; kneel; crouch; and crawl. (Tr. 62-63). Plaintiff was limited in both gross and fine manipulation due to bilateral carpal tunnel syndrome. (Tr. 63). Additionally, plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to his mild COPD. (Tr. 64). Based on his RFC assessment, Dr. Oh felt plaintiff's maximum sustained work capability would be light work and he was "not disabled." (Tr. 67).

In March 2013, plaintiff's physical RFC was reassessed by state agency physician Julio Pardo. (Tr. 91-94, 96-97). Dr. Pardo's assessment mostly agreed with Dr. Oh's initial assessment, except he indicated plaintiff could never climb ladders, ropes or scaffolds, and plaintiff could balance unlimitedly. (Tr. 92-93). Dr. Pardo also felt plaintiff was "not disabled" and could sustain light work. (Tr. 96-97).

## Analysis

Plaintiff argues in several ways that the ALJ improperly analyzed the medical evidence and, as a result, improperly formed plaintiff's RFC assessment. The Court will look first to plaintiff's initial argument that the ALJ erred by not appropriately considering plaintiff's functional capacity evaluation (FCE) on record.

A treating physician's medical opinion is entitled to controlling weight only where it is supported by medical evidence and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001). In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" her reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

It is important to note that the Seventh Circuit has held that medical sources like a physical therapist are not "acceptable medical source[s]" and cannot offer medical opinions. C.F.R. §404.1513. Therefore, ALJ Sayon was not required to analyze the opinion nor was she required to give it any weight. "The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." SSR 06-03P (S.S.A.), 2006 WL 2329939 (S.S.A. Aug. 9, 2006). An ALJ *may*, of course, consider these

opinions, however "the weight they will be given will depend on a number of factors, including the degree to which they are supported by objective evidence." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014). But as a primary point, the ALJ was not required to analyze this opinion as it is not derived from an acceptable medical source and her analysis of the opinion cannot be grounds for remand.

ALJ Sayon assigned no weight to the FCE completed by Mr. Vitale. (Tr. 25-26). She stated that plaintiff "terminated numerous activities [during the evaluation] due to his subjective complaints, and as explained, I do not find the claimant credible." (Tr. 25-26). She also stated that the report stated the results were for what plaintiff could "at least do" but the residual functional capacity assessment is supposed to be based on the most a claimant can do. (Tr. 26).

Plaintiff argues that the FCE covered much more than just the activities plaintiff terminated. He argues that it is "abhorrent" to determine the entire evaluation is invalid because plaintiff terminated a portion of the tests due to subjective complaints. Plaintiff ignores the portion of the FCE where Mr. Vitale stated "[o]bservations on this date are based on what the patient was reportedly able to perform safely and within their pain tolerances. The worker [sic] was progressed according to his subjective tolerances." (Tr. 980). It is evident that the FCE determinations were based on plaintiff's subjective complaints. Plaintiff does not challenge the ALJ's finding that plaintiff's statements of pain and limiting effects of his symptoms were not fully credible.  As a result, plaintiff waives this argument. *See*, *Thompson v. Colvin*, 575 F. App'x 668, 675 (7th Cir. 2014). Since the ALJ found plaintiff's complaints not entirely credible, it follows that Mr. Vitale's opinions that were based upon those complaints were also not credible.

Plaintiff argues that the ALJ is incorrect in stating the report indicated the results of the FCE were what plaintiff could "at least do." He notes that the FCE form stated plaintiff's ability

to sit, stand, or walk used the phrase "at least" but that it was not found elsewhere on the form. The Commissioner argues that the "regulations provide that the RFC is the most a claimant can still do despite any impairments and limitations. 20 C.F.R. § 404.1545(a). Logically, a statement about a person's minimum ability does not establish their maximum ability." (Def.'s Br. Pg.5). The Court agrees that the form does not provide an adequate means to determine plaintiff's maximum capabilities.

Further, even if Mr. Vitale had been an acceptable medical source, the Seventh Circuit has held that the ALJ has not erred when discussing only two of the relevant factors in 20 C.F.R. § 404.1527(c). *Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008). Supportability and consistency are two important factors along with several others to be considered in weighing medical opinions. See, 20 C.F.R. §404.1527(d). ALJ Sayon found that the FCE was not supported beyond plaintiff's subjective complaints and that it was not an appropriate analysis of his capabilities. As a result, she likely evaluated enough of the factors in discounting the opinion to make her analysis adequate.

Additionally, plaintiff states that the ALJ was incorrect to state that the findings by the consultative examiner with regard to plaintiff's treatment for his back "were not replicated elsewhere in the file by another medical doctor." (Tr. 23). While the ALJ should have referenced the similar findings within the FCE, she is not incorrect that no other medical doctors provided similar opinions regarding plaintiff's back. There were few medical records that even referenced plaintiff's back problems past the alleged onset date. The ALJ's determination to not include additional limitations regarding plaintiff's back impairment for lack of support within the record is in line with the requirements of the regulations. 20 C.F.R. §404.1527(d).

Plaintiff then argues that the ALJ did not appropriately consider plaintiff's carpal tunnel syndrome when determining the RFC. He states that the positive Tinel's sign within the consultative examination in combination with the evidence of decreased sensation in the FCE indicate plaintiff's carpal tunnel should have been determined to be severe. He contends that this is important because if plaintiff could only perform occasional repetitive fine finger movements all work would be precluded. (Tr. 52-53).

An RFC is "the most you can still do despite your limitations." 20 C.F.R. §1545(a). In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record." *Id*. "As we have stated previously, an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians. See *Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir.1995). Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record.

As previously stated, the Seventh Circuit has noted that the "second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement." *Weatherbee*, 649 F.3d 568-569. An impairment is considered "severe" if it significantly limits a claimant's ability to do basic work activities. *See* 20 C.F.R. §404.1520(a). ALJ Sayon determined that plaintiff's carpal tunnel syndrome was not severe because plaintiff could perform fine and gross manipulation without difficulty, he had full grip strength bilaterally, and he had no treatment on record for carpal tunnel syndrome. She noted that Dr. Chapa's consultative examination displayed a positive Tinel's sign and that Dr. Chapa diagnosed carpal tunnel syndrome. However, there were no ongoing complaints, treatment, or prescribed medication for this impairment. (Tr. 20).

As the Commissioner notes, the fact that plaintiff had carpal tunnel syndrome is not in dispute. The ALJ found that this was a medically determinable impairment but that it did not significantly limit his ability to do basic work activities and was therefore not a severe impairment. 20 C.F.R. § 404.1521(a). The Court agrees with the Commissioner that plaintiff's clinical signs of carpal tunnel do not automatically cause significant limitations in his ability to do work. *See, Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005).

Plaintiff's consultative examination indicated he had normal gross and fine manipulation with some complaints of numbness. (Tr. 551). As the Commissioner points out, the state agency medical consultants referenced this finding in support of their conclusion that plaintiff could frequently use his hands in the workplace. (Tr. 74, 89). While the state agency consultants determined that plaintiff's carpal tunnel syndrome was severe, they suggested plaintiff should only be limited to frequent but not constant handling and fingering bilaterally. (Tr. 74, 89). The ALJ did not find carpal tunnel to be severe but she included the bilateral hand limitations within her RFC assessment. (Tr. 21-22). There are no additional limitations within the state agency physicians' reports that indicate any greater limitations are needed.

The ALJ is required by 20 CFR §§404.1527(f) and 416.927(f) to consider the state agency physicians' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinions, she may not ignore them either, but must consider them and explain the weight given to the opinions in her decision. *Id.* ALJ Sayon discussed and incorporated these opinions into her RFC assessment appropriately.

Plaintiff contends that the limitations the ALJ included cannot be linked to carpal tunnel syndrome because she did not find this to be a severe impairment. However, the regulations call

for the ALJ to incorporate all medically determinable impairments into the RFC assessment, not just those considered severe. 20 C.F.R. §1545(a). The ALJ's incorporation of the limitations found within the state agency consultants' recommendations in her RFC assessment is appropriate as she found carpal tunnel to be a medically determinable impairment.

Further, plaintiff has failed to meet his burden and indicate what additional limitations the ALJ should have included within the assessment. *See, Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013)("[T]he burden was on [Plaintiff] to explain why she was disabled as a result of her [impairments]. [Plaintiff] failed to satisfy her burden. This is especially true considering [she] was represented by counsel throughout the pendency of the proceedings."). Plaintiff references the FCE's recommendations of occasional fine finger movements and hand movements as evidence that carpal tunnel should have been considered a severe impairment and that work should be precluded. However, the only evidence plaintiff could not perform frequent hand movements is found within the FCE which the ALJ chose to give no weight.

Plaintiff then argues that if there was not enough medical evidence on record to establish carpal tunnel syndrome as severe, the Commissioner should have sought out more consultative examinations. Plaintiff essentially contends that because there was not a significant amount of evidence on record regarding plaintiff's carpal tunnel syndrome the state should have provided more evidence of the impairment. However, the state agency consultants thought the record was adequate to assess the impairment appropriately and did not indicate they needed further testing. As the Commissioner notes, state agency physicians are "are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i). Plaintiff's claims that the state agency assessments contradict the ALJ's findings and more medical testing was needed are unfounded.

Finally, plaintiff contends that the ALJ did not give appropriate weight to the consultative examiner's findings regarding plaintiff's ability to squat and rise. Dr. Chapa indicated plaintiff was unable to squat and arise on examination. (Tr. 551-52). He did not incorporate this limitation into his ultimate conclusions regarding plaintiff's diagnoses nor did he tie that to plaintiff's ability to work. While the Court disagrees with the Commissioner that this was insignificant to Dr. Chapa's report, the Court agrees that the state agency physicians reviewed this report and thought it consistent with an RFC for light work.

The ALJ's RFC limits plaintiff to occasional stooping and crouching. As the Commissioner points out, even if plaintiff were unable to squat, the jobs identified by the VE would remain unaffected since sorter, inspector, and bench assembler require no stooping, kneeling, or crouching. *See* Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles 204, 206, 284 (1993). The Seventh Circuit has repeatedly held that an ALJ's conclusions are not undermined when postural limitations are omitted from an RFC but those limitations are not necessary for the jobs presented by the VE. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 803 (7th Cir. 2005), *Mays v. Colvin*, 739 F.3d 569, 579 (10th Cir. 2014), *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008).

In sum, plaintiff's arguments are, in effect, nothing more than an invitation for the Court to reweigh the evidence. However, the reweighing of evidence goes far beyond the Court's role. Even if reasonable minds could differ as to whether Mr. Gregory is disabled, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## <u>Conclusion</u>

After careful review of the record as a whole, the Court is convinced that ALJ Sayon committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Rex Allen Gregory's application for disability benefits is **AFFIRMED**.

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDRED.**

**DATE:** 2/16/2017

*s/J. Phil Gilbert*
**J. PHIL GILBERT**
**U.S. DISTRICT JUDGE**